EXHIBIT

**A**

## SYSTEM BOARD OF ADJUSTMENT

| | |
|---|---|
| ADELINE CLARK, et. al., | ) |
| | ) |
| Grievants, | ) **OPINION AND AWARD** |
| | ) |
| v. | ) Grievances Concerning Equity |
| | ) Participation and Equity Participation |
| ASSOCIATION OF FLIGHT ATTENDANTS - | ) Payments |
| COMMUNICATION WORKERS OF | ) |
| AMERICA, | ) |
| | ) |
| Union, | ) |
| | ) |
| v. | ) |
| | ) |
| FRONTIER AIRLINES, INC., | ) |
| | ) |
| Company | ) |

Hearing Date: March 20, 2018

Hearing Location: Denver, Colorado

Date of Award:  October 23, 2018

### BOARD MEMBERS

Association Member:   Ed Gilmartin
Company Member:    Howard Diamond
Neutral Member:    John B. LaRocco

### APPEARANCES

| For the Grievants | For the Union | For the Company |
|---|---|---|
| Jason D.  Walke | Jeffrey A.  Bartos | Chris Hollinger |
| Walke Law, LLC | John J.  Grunert | O'Melveny & Myers |
| 204 West Hickman Road, | Guerrieri, Bartos & Roma | Two Embarcadero Center, 28th Fl. |
| Waukee, Iowa 50263 | 1900 M Street, NW, Suite 700 | San Francisco, CA 94111 |
| | Washington, DC 20036 | |
| Kellie L. Paschke | | |
| Skinner & Paschke | Peter Swanson | |
| 204 West Hickman Road | Association of Flight Attendants | |
| Waukee, Iowa 50263 | 3960 Minnehaha Avenue | |
| | Minneapolis, Minnesota 55406 | |

## OPINION OF THE BOARD

I.    INTRODUCTION

On May 25, 2017, former Frontier Airlines Flight Attendant Adeline Clark and other former Frontier Flight Attendants initiated a grievance charging that Frontier Airlines, Inc. (Company) allegedly violated Article 24 of the applicable collective bargaining agreement because the former flight attendants did not receive certain monetary payments in 2017.[1]  [Joint Exhibit 7]  These former flight attendants filed a supplemental grievance on June 13, 2017. Previously, another group of former Company flight attendants initiated a grievance on May 12, 2017 raising the same charges subsequently set forth in the May 25, 2017 grievance.[2]  The former flight attendants who grieved on May 12, 2017, filed a supplemental grievance on May 15, 2017.  [Joint Exhibit 5 and 6]  The group or class of former flight attendants are the Grievants.

On the property, a hearing was held on June 20, 2017.  On June 30, 2017, the Company denied both grievances.  [Joint Exhibit 9]  The Grievants appealed the grievances to this System Board of Adjustment (Board) on July 13, 2017.  The grievances are properly before the Board for decisions on their merits pursuant to Articles 18 and 19 of the 2011-2016 Collective Bargaining Agreement (Agreement) between the Company and the Association of Flight Attendants-Communication Workers of America (Union).

At the commencement of the hearing, the parties were unable to stipulate to the issue presented to the Board.

---

[1] The Law Firm of Skinner & Paschke filed the grievances on behalf of the former Company flight attendants.  [Joint Exhibits 7 and 8]

[2] The May 12, 2017 grievance was filed on behalf of the former Company flight attendants by the Law Firm of Lohf Shaiman Jacobs Hyman & Feiger.  [Joint Exhibits 5 and 6]

The Grievants stated the issue as did the Company violate Article 24 of the Agreement when the Company failed to pay Grievants' equity pay outs covering the period January 1, 2012 through March 15, 2017, and if so, what is the appropriate remedy?  The Union and the Company framed the issue as whether the March 15, 2017 equity participation agreement violated Article 24 of the Agreement and if so, what shall be the remedy?  [TR 9]

The parties empowered the Board to adopt the Grievants' issue or the Union's and the Company's issue or to compose its own issue.  [TR 9]

At the conclusion of the hearing, the three parties expressed a preference for filing post hearing briefs in lieu of closing oral arguments.  The Neutral Member of the Board received the briefs on June 29, 2018.  The matter was deemed submitted after declarations were filed on or about July 15, 2018.

II.     PERTINENT AGREEMENT PROVISIONS

In compliance with the Railway Labor Act, 45 U.S.C. §151, §184, Article 19.A of the Agreement established a Frontier Flight Attendants' System Board of Adjustment.  Article 19.B, which governs the Board's membership, provides:

> 1.   The Board will be comprised of a Company Board Member, a Union Board Member, and a single neutral member (i.e., the Chairperson).
>
> 2.   Each Board member will be free to discharge his/her duty in an independent manner, without fear that his/her individual relations with the Company or with the Union may be affected by action taken in good faith in his/her capacity as a Board member.  Board members who are employees of the Company will be granted time off to attend the hearing and subsequent executive session(s).
>
> 3.   The parties will agree on a panel of nine approved arbitrators from which neutral members will be selected

using the alternate strike method.   The panel will be established within 45 calendar days of the signing of this Agreement.   Once selected, a party may permanently remove a neutral from the panel after one year; however, the neutral may not be removed from any case to which he/she has already been assigned without agreement between the Company and the Union.  If a panel member is removed by a party, voluntarily removes him/herself from the panel, or can no longer act as a neutral (e.g., death, illness, retirement), the parties will select a mutually agreeable permanent replacement.

4.   Notwithstanding the foregoing, the parties may at any time agree to select a neutral who is not a member of its standing panel to sit as the Chairperson of the System Board of Adjustment.  [Joint Exhibit 1]

This dispute primarily revolves around Article 24 of the Agreement which is entitled "Equity, Profit-Sharing, and Wage and Benefit Snapbacks".   The full text of Article 24 is set forth below.

## A.  EQUITY PARTICIPATION

Flight Attendants will be entitled to equity in the Company (the "Equity Participation") as described herein:

1.  The value of the Equity Participation is $16.0 million.

2.  The Equity Participation value will be converted to first dollar equity in the Company at a ratio of the greater of $0.18 per dollar of new equity invested in the Company, or any higher rate offered to any other key stakeholder in the restructuring process.

3.  The terms of the Equity Participation by and for the benefit of the Participating Flight Attendants will be equal to the terms obtained by a third party investor in an Equity Event or, if the Equity Event is a public offering of securities in the Company, the form of securities offered in the public offering.

4.  Other minority investor rights by and for the benefit of the Participating Flight Attendants will be negotiated, including tagalong rights and customary dragalong rights.

5.  Vesting:  The Equity Participation will vest in proportion to the actual Investments as set forth in the letter dated October 11, 2011 between the Company and the Union entitled "Flight Attendant Restructuring Investments".  To the extent the Investments as set forth in the referenced letter cease or are not made, the value of the Equity Participation in Paragraph A.1.a above will be reduced by the net present value discount rate of 15%.

## B.  PROFIT SHARING PROGRAM

The Company has established a Profit Sharing Plan (the "PSP") for employees participating in the Company's restructuring efforts.  According to the terms of the PSP, the Company will make contributions as follows:

1.  For pre-tax earnings greater than 2%, but less that 4% of total Company revenue, 50% will be contributed to the PSP.

2.  For pre-tax earnings greater than 4%, but less than 6% of total Company revenue, 25% will be contributed to the PSP.

3.   For pre-tax earnings greater than 6% of total Company revenue, 10% will be contributed to the PSP.

4.  50% of contributions to the PSP will be allocated to the Frontier pilots and the remaining 50% will be allocated to the other participating Frontier employee groups in proportion to their contribution.   The proportional share of the Flight Attendant group is 18% of the 50% share of the non-pilot groups.

5.   The Company will distribute all profit sharing payments no later than April 30 of each year based on the audited results from the preceding calendar year.

### C. SNAPBACKS

1.  The overtime threshold, per diem and holiday pay will be reinstated if the Company is profitable for two consecutive years with pretax profits in excess of 5%, after profit sharing.

2.  The Company's matching contribution to the 401K Plan will be reinstated if the Company posts 2 straight years of pre-tax profits in excess of 5%, after profit sharing.  The Company retains the right to restore the Company's matching contribution partially or fully in its discretion.  Effective with the first paycheck in July 2016, the Company's matching contribution to the 401k Plan will be reinstated.

### D. ADDITIONAL PROVISIONS

Equity Participation as set forth in Paragraph A above and participation in the PSP as set forth in Paragraph B above, will be exclusively for Frontier Flight Attendants on the Frontier Flight Attendant Seniority List as of January 1, 2012.  This exclusion includes anyone who changes Class and Craft as outlined in Article 10 Seniority of this Agreement.  [Joint Exhibit 1]

Article 24.D refers to Agreement Article 10.  Articles 10.C and 10.E provide:

### C. TRANSFERS:

1.  A Flight Attendant transferring or who has transferred to a position(s) within the Inflight Services Department outside the coverage of this Agreement will retain and accrue seniority for a period of 2 years and if transfers back to a Flight Attendant position within that time will have his/her seniority reinstated as if he/she had not transferred.  After a 2 year period the Flight Attendant occupying such position(s) will retain but not accrue seniority.

2.  Any Flight Attendant who directly transfers to any position(s) outside of the Inflight Department will retain (but not accrue) seniority and longevity for 1

year from the effective date of the transfer. Upon Company approval, such individuals may return to a position covered under this Agreement prior to the end of the one-year period. If such an individual does not return to a position covered under this Agreement prior to the one-year expiration date, his/her name will be removed from the seniority list.

3. A Flight Attendant who is elected to or accepts a full-time position with the Union will retain and accrue seniority and longevity while working for the Union.

4. If a Flight Attendant is permitted by the Company to transfer to a position outside of the Flight Attendant craft or class on account of physical incapacity, illness, or injury, he/she will retain and accrue seniority for a period not to exceed 2 years of "continuous" service in such position after which the Flight Attendant will be removed from the seniority list. A period of service will be deemed "continuous" service until it is broken by a transfer back to the position of Flight Attendant.

5. Paragraph E (Seniority Rights Forfeited) also applies to employees covered under this Paragraph C. for purposes of removal from the seniority list.

* * *

## E. SENIORITY RIGHTS FORFEITED

A Flight Attendant covered under this Agreement, whose employment with the Company is permanently severed, will forfeit his/her seniority rights and that Flight Attendant's name will be removed from the seniority list. Such circumstances include, but are not limited to: resignation, discharge for cause, retirement, failure to return to active service following an authorized leave of absence, the covered Flight Attendant is not recalled from furlough within 3 years from the date of furlough, or the covered Flight Attendant does not comply with policies and procedures relating to furlough and recall. The recall period for any Flight Attendant(s) can be extended 2

additional years by mutual agreement of the Union and
the Company. [Joint Exhibit 1]

Article 2 of the Agreement enumerates many definitions. Article 2.32 reads:

**Flight Attendant** - An employee of the Company whose
name appears on the Flight Attendant Seniority List as
defined by Article 10 of this Agreement, and whose duties
include the performance of inflight and ground cabin
services. [Joint Exhibit 1]

The Union and the Company entered into a Letter of Agreement on March 15, 2017

(March 15, 2017 LOA) which is entitled "Equity Participation Payment". Paragraphs A(1) and

A(2) of the March 15, 2017 LOA read:

1. Payment. In full and complete satisfaction of all of the
Company's obligations in respect of the Equity
Participation and Article 24A of the CBA, the
Company agrees to pay to the eligible Flight Attendants
an aggregate amount equal to forty million dollars
($40,000,000) (the "Equity Participation Payment"),
which shall be payable as follows: (a) thirty six
million, five hundred thousand dollars ($36,500,000)
shall be remitted to individual Flight Attendants in six
substantially equal installments on the first payroll date
of each month commencing on June 1, 2017 (each, a
"Payment Date"), less any applicable withholdings, in
accordance with the Allocation Schedule (as defined
below) and (b) three million, five hundred thousand
dollars ($3,500,000) will be remitted to a third party
escrow agent in accordance with Section B of this
Letter of Agreement.

2. Allocation Schedule. No later than May 1, 2017, the
Union shall provide the Company with a written
schedule (the "Allocation Schedule"), setting forth the
name and employee identification number of each
Flight Attendant eligible to receive a portion of the
Equity Participation Payment (each, an "Eligible Flight
Attendant") and the gross amount of the Equity
Participation Payment to be paid to each Eligible Flight
Attendant upon each Payment Date. The Union shall

> determine the Eligible Flight Attendants and their
> portion of the Equity Participation Payment in its sole
> discretion, provided, that the total Equity Participation
> Payments identified on the Allocation Schedule for any
> Payment Date shall not exceed the aggregate payment
> the Company is obligated to make on such Payment
> Date pursuant to this Letter of Agreement (after giving
> effect to the Escrow).  The Company may rely on the
> Allocation Schedule for all purposes hereof.   [Joint
> Exhibit 3]

Paragraph A(1) refers to a third party escrow.  Paragraph B of the March 15, 2017 LOA

describes the escrow as follows:

### Escrow for Administrative Costs, Fees and Expenses.

> No later than June 1, 2017, the Company shall deposit with
> a third party escrow agent to be identified in writing by the
> Union (the "Escrow Agent") an amount equal to
> $3,500,000 (the "Escrowed Amount") to be held in escrow
> by the Escrow Agent to reimburse the Union for any
> reasonably documented costs, fees and other expenses
> associated with the negotiation and execution of this Letter
> of Agreement, including the fees and expenses of the legal
> and financial advisors retained by the Union in connection
> herewith, and the administration of the Equity Participation
> Payments pursuant to the terms and conditions of an
> escrow Agreement.  At such time as the Union determines
> that the Escrowed Amount exceeds the amount needed to
> reimburse costs, fees and other expenses associated with
> the administration of the Equity Participation Payments, the
> Union shall cause such funds to be remitted to Eligible
> Flight Attendants.   In order to provide administrative
> assistance to th Union in connection with any such
> remittances, the Company will facilitate such payment,
> through its payroll system, as soon as administratively
> practicable and, in any event, within thirty (30) days,
> whereupon the Company shall pay an aggregate amount
> equal to such excess funds provided to it by the Union, less
> applicable withholdings, to Eligible Flight Attendants in
> accordance with an Allocation Schedule provided by the
> Union in writing and otherwise subject to the other terms
> and conditions hereof.   The Union shall be solely

responsible to pay its fees and expenses related to this
Letter of Agreement and the Company shall have no
obligation therefor.  [Joint Exhibit 3]

Paragraph D of the March 15, 2017 LOA reads:

**Indemnification**

The Union shall indemnify, defend and hold harmless the
Company and its affiliates and their respective
shareholders, members, partners, directors, managers,
officers, employees, affiliates, agents and advisors from
and against any damages, losses, deficiencies, obligations,
penalties, judgments, settlements, claims, payments, fines,
interest costs and expenses, including the costs and
expenses of any and all actions and demands, assessments,
judgments, settlements and compromises relating thereto
and the costs and expenses of attorneys, accountants,
consultants and other professionals incurred in the
investigation or defense thereof or the enforcement of
rights hereunder relating to or resulting from any claim
made by any Flight Attendant or group of Flight Attendants
to the extent relating to his, her or their allocation of the
Equity Participation Payment as set forth in the Allocation
Schedule.  [Joint Exhibit 3]

Paragraph E(2) of the March 15, 2017 LOA provides:

**<u>Miscellaneous</u>**

2.  <u>Entire Agreement</u>.  This letter of Agreement constitutes
the entire understanding of the parties with respect to the
subject matter hereof and is entered into in full and
complete satisfaction of Section 24A of the CBA.  Any
representation, warranty, promise or condition, whether
written or oral, not specifically incorporated herein, shall
not be binding or of any force or effect upon the parties.

## III.   CONSIST OF THIS BOARD

At the commencement of the hearing, the Grievants vigorously objected to the

composition of this Board.  The Grievants represented that the Company and Union Board

Grievants v. AFA and Frontier
Equity Participation Payments                                                    Page 10

Members were involved in the negotiations and discussions concerning documentary evidence

that they will evaluate as decision makers.[3]   The Grievants also objected to the Union's

appearance in this proceeding.   The Grievants' claim that because they filed the grievances

exclusively with the Company, the Union is not a proper party to this dispute.  [TR 11-12]

    In its post-hearing brief, the Union contended that this Board was properly constituted

and convened in compliance with the Railway Labor Act, 45 U.S.C. §151, 184, and Article 19 of

the Agreement.  The Union submits that the Agreement mandates a Company appointed member

and a Union appointed member.  The Union avers that the individual arbitrators (members of the

Board) have a duty to decide cases fairly without regard to partisan predilections.  *Cunningham*

v. *United Airlines,* 2014 WL 441610 (ND Ill 2014).  The Union argues that it is a proper party to

this proceeding because the Grievants are claiming that the Union breached its duty of fair

representation.  Alternatively, the Union submits that Grievants waived all arguments concerning

the composition of this Board by not raising any objection during the grievance procedure on the

property.

    This Board concludes that its membership complies with Article 19 of the Agreement.

The Neutral Member of the Board does not have any authority to direct the parties to appoint or

to refrain from appointing any particular individual as a member of the Board.  Moreover, as the

Union points out, Agreement Article 19.B.2 provides that the Board members must exercise

their duties as Board members in ". . . . an independent manner".  The partisan Board members

relationships with their respective parties are protected so long as they exercise their duties ". . .

in good faith".  The Board is properly constituted.

---

[3] In essence, Grievants charge that the Union and Company Board members are biased against the Grievants.

Grievants v.  AFA and Frontier
Equity Participation Payments                                                    Page 11

The Neutral Member also holds that the Union is an indispensable party to this dispute

because it is a signatory and a co-author of the Agreement that Grievants allege that the

Company violated.  The Union has a legitimate interest to insure that the Agreement and the

March 15, 2017 LOA  are properly interpreted and applied.  The Union also has a right to come

to this forum to defend any claim that the Union did not fairly represent Grievants when they

were members of the Union.[4]

IV.     BACKGROUND AND SUMMARY OF THE FACTS

     A.     The Grievants

     The Grievants are approximately 100 flight attendants who were employed by the

Company and appeared on the Flight Attendants' seniority list as of January 1, 2012.  [TR 36]

They ended their employment with the Company prior to March 15, 2017.  For example, the

Company hired Grievant Faith France in February, 2007 and she voluntarily ceased employment

in November, 2015.  [TR 28, 41]  Grievant Steven Shaw started with the Company in January,

2006.  He retired in October, 2016.  [TR 74]   Grievant Darol Glasscock was hired by the

Company on January 2, 2007.  According to his declaration dated April 16, 2018, he severed his

employment in March, 2015.   Company and Union records indicate he resigned from the

Company on April 24, 2015.

---

[4]The Grievants argument that the Union is not a proper party to this dispute raises a paradox.  If the Union was
barred from this proceeding, it would be exposed to a duty of fair representation claim brought by current members
by not insuring the proper application and enforcement of the Agreement.  Suffice it to state, the Union must fairly
represent its members. *Vaca* v. *Sipes*, 386 U.S. 1717 (1967).

    B.    The Restructuring Investment (Concessions) and the Negotiating History of Agreement Article 24

After the Union was certified to represent the class and craft of flight attendants at the Company in May, 2010, Erika Schweitzer became Master Executive Council (MEC) President and Chair of the Union's negotiating team.  [TR 84]  Besides Schweitzer, Grievant Glasscock,  Flight Attendant Theresa Owens and Union International Staff Negotiator Suzanne Balzer served on the Union's negotiating team.  [TR 134, 138, 131, 84]  Jacalyn Peter, who is now the Company's Vice President of Labor Relations, served as one of the members of the Company's bargaining team.  [TR 241-242]  During 2010 and 2011, the parties embarked on reaching the first Flight Attendants' collective bargaining agreement on this property.

At about the same time, Republic Airways Holdings acquired the Company while the Company was in bankruptcy.  A short while later, Republic sought to sell or shut down the Company because, as Balzer stated, the Company was "draining" cash from Republic.  [TR 140]

During the 2010-2011 negotiations, Republic and Company officials peremptorily told the Union bargaining team that the Company needed to impose concessions worth $16 million over four years on the flight attendant bargaining unit.[5]  [TR 142]  The Company demanded concessions from other employees.  Balzer related that the Company reached an agreement with the Frontier Air Line Pilots Association that apparently required the Company to extend equity and profit sharing benefits to other employee groups in exchange for imposing the concessions.  [TR 144-145]

---

[5] The cuts were to go into effect on or after September 1, 2011.  [TR 142]

Balzer and Schweitzer testified that the Company negotiators wrote and presented Article 24 to the Union.  Peter recalled that Balzer wrote Article 24.D while the Company negotiators wrote Articles 24.A, 24.B and 24.C.  [TR 91, 244, 160, 145]  Balzer and Schweitzer emphasized that Article 24 was not negotiated.[6]  However, they related that, after the Company negotiators told the Union negotiators that the Union could determine who would receive the equity payments (if the equity ever had value) and the profit sharing, the parties added Paragraph D to Article 24.  [TR 92, 147, 158]  Balzer recounted that the Union engaged in internal discussions whereby the Union determined that every flight attendant on the seniority list as of a certain date, excluding new (subsequent) hires and flight attendants who left the Company, would receive equity participation payments and profit sharing distributions.  [TR 146]

Schweitzer characterized Article 24 as "something better than nothing" for the Company's imposition of extensive concessions.  [TR 92]  Balzer opined that "nobody thought it [Article 24.A] was worth anything".  [TR 156]  [Brackets added for clarification.]

Balzer stated that the negotiators did not intend for Article 24 to cover people who left the Company albeit, she acknowledged that Article 24.D does not directly state that former employees are excluded.  [TR 162-163]  Balzer also acknowledged that there is not any express language in Article 24 stating a continuous employment requirement.  [TR 167]  Balzer was certain that before the ratification vote, flight attendants were notified at Union road shows (explaining the Agreement to Union members) that continuous employment was a requirement

---

[6] Balzer explained that since no collective bargaining agreement had been negotiated, the Company claimed that it had the right to unilaterally implement the concessions, and so, Article 24 was non-negotiable.  [TR 140-141]

Grievants v. AFA and Frontier
Equity Participation Payments                                                          Page 14

to participate.[7] [TR 167-168]  According to Balzer, the flight attendants were more interested in

profit sharing than equity participation.  [TR 155]  Balzer recalled that Grievant Glasscock made

at least one presentation where he told flight attendants that, to receive profit sharing, they had to

be on the seniority list as of January 1, 2012 and stay employed until the profit sharing was

distributed.  [TR 155-156]

      Schweitzer understood that Article 24.D required flight attendants to be

continuously employed to receive profit sharing and to participate in equity.   [TR 97]

Schweitzer claimed that while Article 24 does not use the term "currently employed", Article

24.D refers to Article 10 which defines current employment as a flight attendant on the seniority

roster.  [TR 87]  According to Schweitzer, Article 10.E contains the exclusion from Article 24,

that is, flight attendants who no longer hold seniority.  [TR 88-90]  Schweitzer elaborated that

the exclusion in Article 24.D is anyone who changes class and craft, as outlined in Article 10,

which Schweitzer understood to mean that a flight attendant had to be continuously employed to

receive any benefit under Articles 24.A and 24.B.  [TR 97]

      Sherrie Thompson, who started with the Company in 2006 and became MEC

Secretary Treasurer in 2014, claimed that the reference to Article 10 in Article 24.D means a

flight attendant must maintain continuous employment to be eligible for an Article 24.A equity

participation payment.  [TR 173, 209]  Nonetheless, she conceded that the language in Article

24.D is vague.  [TR 210]

      Peter understood that Article 24.D, along with Article 10, required a person to be

a flight attendant to receive an Article 24.A payment, as well as to have been on the seniority list

---

[7] The Agreement was ratified on August 29, 2011.

as of January 1, 2012.  [TR 246]  Peter asserted that a person who resigns or retires does not

satisfy the Article 2.32 definition of a flight attendant.  [TR 247]  Thus, Peter opined that Article

24.D and Article 10 provide that a person receiving an Article 24.A payment must be a current

flight attendant.  [TR 247, 257]

       Balzer testified that the Company and Union negotiators had no discussions

whereby Article 24 gave a vested right to flight attendants.  She was certain the Union

negotiators never told Company negotiators that Article 24 created an individual right that would

survive after a flight attendant left Company employment.  [TR 156-157]

       France knew that she forfeited her seniority when she resigned from the

Company.  France stressed that Article 24.D does not state continuous employment as a

requirement to receive an equity participation payment so that her seniority forfeiture was

irrelevant.  [TR 44, 50]  France opined that if a flight attendant was on the flight attendant

seniority list as of January 1, 2012, the flight attendant is eligible to participate in an equity

participation payment.  [TR 70]

       Schweitzer testified that Article 24.A.3 mentions a public offering as an equity

event, but she acknowledged that there could be more than one type of equity event.  [TR 104]

She noted that Article 24.A did not define an equity participation.  [TR 98]

       On October 11, 2011, Schweitzer and Peter signed a letter entitled "Flight

Attendant Restructuring Investments".  This letter set forth the concessions that the flight

attendants would absorb, including longevity step freeze, sick leave accrual reduction, vacation

credit reduction, suspension of Company contributions to the 401k plan, reduction of paid

holidays, reduction of per diem, an increase in the monthly hour threshold for overtime pay, and

other concessions valued at $16 million. [Joint Exhibit 2] Schweitzer related that the Company

implemented several concessions in September, 2011 and the remainder on January 1, 2012.

[TR 101]

Three days after signing the restructuring investment letter, the parties signed the

Agreement (adopting Article 24) which was retroactive to August 29, 2011. [Joint Exhibit 1]

Grievant France was aware of the Flight Attendant Restructuring Investments.

She emphasized that she endured the concessions. [TR 36] Schweitzer acknowledged that all

flight attendants, including the Grievants, gave up these concessions while they were employed

with the Company. [TR 99] Schweitzer asserted that while Grievants made concessions, ". . .

they chose to walk away from the possibility of being paid out equity . . ." [TR 99] When

Grievant France left the Company in November 2015, nobody told her that she was giving up a

chance at equity participation. [TR 41-42] In his declaration, Grievant Glasscock stated that he

did not recall the Union informing its members that they must remain continuously employed to

be eligible for an equity participation payment.

C.      The 2014 Tentative Agreement

Thompson testified that in 2014, the Company wanted to provide flight attendants

with contract improvements and cash in exchange for Article 24. [TR 174] As a result, the

parties entered into a tentative equity and profit sharing letter agreement. [Union Exhibit 5]

Section 1 of the 2014 tentative letter agreement provided:

> Thirty days post-ratification the sum of One Million Eight
> Hundred Sixty-Two Thousand Four Hundred
> ($1,862,400.00) Dollars will be equally distributed among
> Flight Attendants currently employed as Flight Attendants
> who were on the Frontier Flight Attendant Seniority List as

of January 1, 2012 (hereinafter "1/1/2012 group")
consistent with the requirements of Article 24.D.

In addition, the following distributions will be made:
April 1, 2015: $312,500 distributed equally to the 1/1/2012
group.
April 1, 2016: $312,500 distributed equally to the 1/1/2012
group. [Union Exhibit 5]

Thompson pointed out that the tentative agreement clearly stated that a flight attendant must be

currently employed to receive the distribution. [TR 180]

On the Union's Facebook page, flight attendants commented on the tentative

agreement. Grievant Glasscock posted a message saying: "Because Article 24 doesn't mean

anything frankly. And if we have back 95% of what we gave up, we will start negotiating from

there rather than where we are now." [Union Exhibit 6] Grievant France testified that she was

in favor of the tentative agreement. [TR 65] She wrote on the Union Facebook page that if a

flight attendant retires before the "Great day we go public and make millions, you won't get

anything." She further wrote, "So, unless you are going to be here 6 or 7 years, you might want

to do your math again." [Union Exhibit 2] Grievant France testified that her comment was a

response to a fellow flight attendant who was against the tentative agreement and her comment

did not constitute her opinion. [TR 66]

The tentative agreement was not ratified. [TR 175]

D.      Profit Sharing Distributions

The Union determined that the Company did not owe flight attendants any profit

sharing for 2013. [TR 180] The first profit sharing payment was made in April, 2015 based on

profits generated during the 2014 calendar year. [TR 181] Thompson stated that to be eligible

for the 2014 profit sharing payment, a flight attendant had to be on the seniority list as of January

1, 2012 and be employed as a flight attendant on April 1, 2015. [TR 181-182] Thompson explained that if a flight attendant retired or resigned on March 30, 2015, the flight attendant did not participate in the profit sharing. [TR 83] On February 18, 2015, the Union sent flight attendants an e-mail message stating that to be eligible for profit sharing, the flight attendant must have been employed on January 1, 2012 and still be a flight attendant at the time of the profit sharing payout. [Union Exhibit 7]

The minutes of a March 3, 2015 Council 71 Skype meeting reflect that a flight attendant is not eligible for profit sharing if the flight attendant severed employment before the profit sharing was distributed. [Union Exhibit 8]

The Company made profit sharing payments in 2016 and 2017 for the calendar years 2015 and 2016. Thompson stated that parties applied the same eligibility criteria for those two years as it was applied to the 2015 distributions.[8] [TR 185]

Grievant France testified that in April, 2015, she received a profit sharing payment covering profits earned in 2014. [TR 57] France declared that although she worked 10 months for the Company in 2015, she did not receive any profit sharing for 2015. Even though she was aware that the Company issued profit sharing payments to flight attendants in 2016 for 2015, France did not grieve. [TR 57-58]

Grievant Shaw acknowledged that he did not receive any profit sharing payment for 2016 and he did not initiate a grievance seeking such payment. [TR 80]

---

[8] Thompson noted that as of February, 2016, many Company flight attendants were not participating in the profit sharing since they had been hired subsequent to January 1, 2012. [TR 188]

In the Declaration of one of Grievants' counselors, the counselor attested that Grievant Glasscock, and three other Grievants, received profit sharing payments after ending their employment with the Company.  In particular, Grievant Glasscock purportedly left the Company in March 2015 yet, he received the profit sharing payment on April 15, 2015.  In her declaration dated July 11, 2018, Thompson stated the Union's records show that Glasscock resigned from the Company on April 24, 2015.  Thus, he was on the seniority list as of April 1, 2015, the operative date for being eligible to receive a profit sharing payment for the 2014 calendar year.  Thompson also represented that Union records show that the other three Grievants resigned or retired during April, 2015 which was after the eligibility cut off date.  In her Declaration dated July 13, 2018, Peter confirmed that Company records matched the Union's records.  Peter testified that the Company did not make any profit sharing payments to flight attendants who were not on the property on the payout date. [TR 249]

E.      The March 15, 2017 LOA and Money Distributions to Flight Attendants

Thompson related that in early 2016, the Union MEC formed a task force to attempt to ascertain the value of the equity participation contained in Article 24.A.  She explained that the Union and the Company then negotiated the issue of the value of Article 24 separate from all other amenable subjects.  [TR 191]  Thompson testified that the separate negotiations resulted in the March 15, 2017 LOA.  According to Thompson, the March 15, 2017 LOA relieved the Company of its Article 24.A obligations and provided the flight attendants with $40 million. [TR 193, 194]

Thompson noted that paragraph A(1) of the March 15, 2017 LOA labels the $40 million as an "equity participation payment".  She initially stated that the $40 million was an

equity participation payment since it arose in exchange for relieving the Company of its Article

24.A obligations.  [TR 222]   However, Thompson clarified her characterization of the $40

million by asserting her belief that the $40 million was just a "payment" rather than an "equity"

payment. [TR 223]  Similarly, Peter disagreed with the characterization of the $40 million as an

equity participation payment because she believed the $40 million was a cash payment in lieu of

a future, potential equity payment.  Peter stated that the $40 million in cash went to the flight

attendants to fully discharge the Company's obligation set forth in Article 24.A.  [TR 251-253]

Although Schweitzer had no role in negotiating the March 15, 2017 LOA, she

opined that it settled Article 24.A.  [TR 112, 132]  She stated that prior to the March 15, 2017

LOA, Article 24.A was never triggered because no equity event had occurred.  [TR 113]

Thompson testified that paragraph A(2) of the March 15, 2017 LOA allowed the

Union to decide who is eligible for payments from the $40 million pool.  [TR 194]

On March 17, 2017, the Union sent a message to its members informing them that

the Company and the Union had resolved the equity participation issue for a total of $40 million.

[Grievants Exhibit 3]  On March 24, 2017, the Union notified its members that an eligible flight

attendant had to be hired prior to January 1, 2012 and had to be continuously on the seniority list

to March 15, 2017 to be eligible for a share of the $40 million.  The message went on to state

why the Union accepted the $40 million in exchange for Article 24.A.  The Union determined

that it was a high risk to wait for any triggering equity event and Article 24.A did not grant flight

attendants any ownership interest in the Company.  [Grievants Exhibit 4]

On March 28, 2017, the Union MEC adopted a resolution for allocating payment

of the available pool consisting of $36.5 million.  The resolution stated that a flight attendant is

eligible to receive a share of the "equity" pool if the flight attendant was continuously on the

flight attendant seniority list from January 1, 2012 through March 15, 2017.  [Union Exhibit 11]

Thompson stated that the MEC adopted the practice of distributing profit sharing payments to

establish the eligibility for the equity participation payments.  [TR 197]  In a message dated

March 31, 2017, the Union informed the flight attendants that a full equity payment would

amount to about $62,000 going to approximately 592 flight attendants.  [Grievants Exhibit 5]

Pursuant to the schedule in paragraph A(1) of the March 15, 2017 LOA, the

Company paid $36,500,000 in six substantially equal installments to the eligible flight attendants

as identified by the Union.  Grievants did not receive any payments.  [TR 49]

Sometime in March 2017, France heard gossip about $40 million.[9]  [TR 42]  When

she inquired about her participation in the $40 million pool, the Union informed France that she

was excluded from the group of eligible flight attendants.  [TR 42]  France related that the Union

told her that she had to have continuous service with the Company through March 15, 2017.

[TR 45]

Grievant Shaw stated that when he retired from the Company in October, 2016,

nobody notified him that he was losing equity participation.  [TR 75]  Similarly, nobody ever

told him that he must work continuously through March, 2017 to receive an equity payment.

[TR 78]  When Grievant Shaw inquired about the equity payment, the Union informed him that

retirees were not included.  [TR 77]

Grievant France wants a "Fair and equitable distribution of what I gave up in my

concessions."  [TR 68]  More specifically, she seeks a proportionate amount of money from the

_____

[9]France is currently a flight attendant employed by Southwest Airlines.  [TR 26]

Grievants v.  AFA and Frontier
Equity Participation Payments                                                      Page 22

$40 million for the time she was employed at the Company subsequent to January 1, 2012.

[TR 49]

V.      THE POSITIONS OF THE PARTIES

        A.      The Grievants' Position

        The Union and Company agreed to Article 24.A in contemplation of the

occurrence of an equity event.  Article 24.A.3 gives a third party investor and a public offering

as examples of equity events which means that the equity event could be more than two types of

occurrences.  Article 24.A.3 is directly tied to the March 15, 2017 LOA which is entitled "Equity

Participation Payment".  Therefore, the equity event alluded to in 24.A.3 was the Company's

$40 million payment to the flight attendants per the March 15, 2017 LOA.  In other words, the

Article 24.A.3 "equity event" occurred when the Company agreed to distribute $40 million to the

flight attendants.  Thompson conceded that the March 15, 2017 LOA triggered equity payments.

The $40 million was the flight attendants' entitlement to equity.

        Since an equity event occurred, Article 24.D entitles each Grievant to an equity

payment from the $40 million pool.  The language in Article 24.D is clear.  Article 24.D has a

single eligibility condition.  The only requirement is that the flight attendant must be on the

flight attendants' seniority list as of January 1, 2012.  The first sentence sets the sole parameter

of eligibility.  The second sentence modifies the first sentence to cover flight attendants going to

a management position or another Company position.  Nothing in the language of Article 24.D

supports the Union's and the Company's interpretation of the provision.   The words

"continuously employed" do not appear in Article 24.D.  Schweitzer and Peter admitted that the

words "continuous employment" cannot be found in Article 24.D.  This omission shows that the

parties' true intent is consistent with the Grievants' position.   In addition, all the witnesses

testified that the intent of Article 24 was to repay flight attendants for the restructuring

investments.  The Grievants sacrificed as part of the restructuring process.  They endured painful

concessions.  Therefore, the Grievants are entitled to their fair share of the equity participation

payment.

   Even if the terminology in Article 24.D is unclear, the Grievants are still eligible

to participate in the $40 million equity event.   Inasmuch as the Company negotiators drafted

Article 24.D, any ambiguous terms must be construed against the Company's interests.  Indeed,

Article 24 was presented to the Union on a take it or leave it basis.  Therefore, the Grievants'

interpretation must prevail.  Both Union and Company witnesses testified that eligibility was

dictated by the terms of Article 24.D yet, the parties deviated from those terms when the

Company allowed the Union to unilaterally set the eligibility criteria.

   Neither the Union nor the Company notified any of the Grievants of a continuous

employment requirement.  During the 2011 negotiations, the Union did not issue any message to

flight attendants telling them that they needed to be continually employed to enjoy the benefits

of Article 24.  The road show presentations did not contain notice that some flight attendants

would be barred from participating in an equity event.  The lack of notice confirms that the

parties did not intend to include a continuous employment requirement in Article 24.D.

   The past practice supports the Grievants' interpretation.  The Company and the

Union rely on the profit sharing distribution practice.  2014 was the first profit sharing year.  The

Company was obligated, pursuant to Article 24.B.5, to make the payments no later than April 30,

2015.  Witnesses for the Company and Union testified that flight attendants must be employed as

the date of the distribution. However, even though Grievant Glasscock left the Company in March, 2015, he received a profit sharing payment on or about April 15, 2015. Three other Grievants received profit sharing payments after they left Company employment. This past practice shows that a flight attendant need not be employed at the time of a profit sharing payment or an equity participation payment.

Based on the experience of these four flight attendants, it is reasonable that all flight attendants would expect to receive an equity payment even if they were no longer employed by the Company when the payment was made. In addition, even if the past practice supports the Union's interpretation of Article 24, the practice did not begin until April of 2015. Therefore, the practice cannot accurately manifest the negotiators' intent back in 2011 when they agreed to Article 24.

Grievants have a vested interest in equity participation. To reiterate, they sacrificed wages and benefits to help improve the financial condition of the Company. Article 24.A.5 clearly provides that each flight attendant's equity participation payment would equal the amount that each flight attendant invested into the Company by accepting the concessions. The Company cannot delegate its equity participation obligation to the Union so that the Union can arbitrarily exclude persons with vested interests in the Company's equity.

The Union and the Company violated Article 24 by fashioning the March 15, 2017 Letter Agreement. Once equity participation payments are vested with flight attendants under Article 24.A, the Company and the Union cannot nullify the right. The Company and the Union improvidently tried to eliminate Article 24, in a conspiratorial scheme, to allow the Company to evade its obligation to the Grievants. Even though the Grievants contributed to the

Company's success, the Union and the Company are arbitrarily withholding money from the Grievants.  The Union is manipulating the eligibility rule to reward current members.

The Company must now honor its promises that it made in Articles 24.A and 24.D by making an equity payment to each Grievant.

B.    The Union's Position

The Grievants have not met their burden of proving that either the Company or the Union committed any violation of Article 24 of the Agreement or the March 15, 2017 LOA.

There cannot be any violation of Article 24.A inasmuch as that contract provision was no longer effective after March 15, 2017.  Once Article 24.A was removed from the Agreement by the March 15, 2017 LOA, the provision no longer existed.  It logically follows that a non-existent provision cannot be violated.  As a result, the Grievants can only succeed if any rights they may have under Article 24.A vested prior to March 15, 2017, or if the March 15, 2017 LOA was invalid so that Article 24.A remains in effect.

The March 15, 2017 LOA eliminated Article 24.A.  A plain reading of the March 15, 2017 LOA shows that the $40 million payment was "full and complete satisfaction of all of the Company's obligations" for equity participation and Article 24.A.  It is true that the March 15, 2017 LOA may have mislabeled the $40 million pool as equity when, in actuality, the $40 million was a cash payment.  Therefore, no evidentiary weight can be given to the title of the March 15, 2017 LOA.

Neither the Company nor the Union violated the March 15, 2017 LOA because paragraphs A(1) and A(2) plainly provide for the Union to determine flight attendant eligibility to receive the cash payments.  On March 28, 2017, the Union MEC passed a resolution which set

the eligibility criterion.  The criterion was that a flight attendant must be continuously on the flight attendant seniority list from January 1, 2012 to March 15, 2017.  Grievants were not eligible since they forfeited their seniority when they left the Company prior to March 15, 2017.

The Grievants cannot prove that the Union breached its duty of fair representation because the Union did not owe any duty to Grievants at the time that it passed the resolution. The Grievants were not in the bargaining unit on March 28, 2017.  Put simply, they were not represented by the Union.  The Union owes no duty of fair representation to former bargaining unit members.   Therefore, the March 15, 2017 LOA was a valid, enforceable collective bargaining agreement.

Article 24.A did not create a vested right for Grievants before March 15, 2017. The US Supreme Court has held that there is a presumption that a contract obligation ceases upon termination of the collective bargaining agreement unless explicit terms provide that certain provisions will continue to be effective after the expiration of the agreement.  *M&G Polymers, USA* v. *Thackett*, 135 S.Ct. 926 (2015)  Article 24.A does set forth any language that it continues to be effective regardless of a subsequently negotiated agreement that terminated Article 24.A.

Alternatively, Article 24.A did not establish any vested rights to an equity participation payment for any flight attendant.  The first sentence states that "flight attendants will be" entitled to equity in the Company.  Agreement Section 2.32 defines a "flight attendant" as an employee of the Company on the flight attendant seniority list which means only current employees.  So, a flight attendant's rights under Article 24.A end when the flight attendant severs employment with the Company.

Next, pursuant to Article 24.A.3, a flight attendant's entitlement to equity participation only arises if and when an equity event occurs. No equity event occurred before the Company and the Union entered into the March 15, 2017 LOA. The Grievants did not offer any testimonial or documentary evidence that an equity event arose. Thus, Article 24.A was never triggered.

The Grievants cannot rely on Article 24.A.5. The vesting in Article 24.A.5 only refers to the restructuring investments (the concessions) and not what flight attendants might receive should an equity event ever arise. Articles 24.A.3 and 24.A.5 clearly connote that an equity payment is contingent on future events and, to reiterate, an equity participation event never occurred.

Even if the Grievants acquired some rights under Article 24.A, Article 24.D states that the benefits in Article 24.A go exclusively to flight attendants who were on the seniority list on January 1, 2012 and who fit the definition of a flight attendant in Agreement Section 2.32. Grievants misconstrue the word "exclusively" to mean a flight attendant receives profit sharing and equity if they were on the seniority list as of January 1, 2012. Instead, the word "exclusively" sets the circle of possibly eligible flight attendants, but does not preclude a tightening of the circle.

In addition, Article 24.D refers to Article 10 of the Agreement. Article 10.E provides that a flight attendant forfeits seniority when the flight attendant severs employment with the Company. Therefore, Article 24.D has an exclusion. To be entitled to an equity participation payment, a flight attendant must have been on the seniority roster on January 1, 2012, and thereafter, maintain flight attendant seniority.

The Grievants did not submit any extrinsic evidence to support their claim that the parties intended to vest lifetime rights in former flight attendants when they agreed to Article 24.A.  Balzer testified that there were no discussions wherein the Union negotiators told the Company negotiators that a flight attendant's entitlements under Article 24.A survive after the flight attendant leaves the Company.  Thus, the negotiators lacked any intent to create a vested right.  The negotiating history does not support the Grievants' interpretation of Article 24.A.

The past practice supports the Union's interpretation.  Each year since 2015, Article 24.B profit sharing payments have been made to flight attendants on the seniority list as of January 1, 2012, and on the list at the time of the profit sharing payment.  While the Grievants claimed that four flight attendants received payments after they ceased employment, Thompson attested that Union records show that those flight attendants were still employed on the date of the profit sharing pay out.

Grievants France and Glasscock recognized that there was no vested entitlement in Article 24.A.  They made contemporary representations during member discussions about whether or not to ratify the 2014 tentative agreement.  Grievant France stated that if a flight attendant retires, the flight attendant gets nothing.  Grievant Glasscock stated that Article 24 does not mean anything.  Thus, the Grievants knew that the equity participation was only available to current employees.

The Union urges the Board to deny the grievances.

C.     The Company's Position

Article 24.A established a contingent right which would only materialize if and when an equity event occurred.  Such an event never happened prior to the extinguishment of

Article 24.A by the March 15, 2017 LOA.  Article 24.A expired before the Company made the payments from the available pool of $36.5 million.

Stated differently, the March 15, 2017 LOA extinguished any speculative rights Grievants may have had under Article 24.A.  The cash payment of $40 million fully satisfied the Company's obligation with respect to equity participation in Article 24.A.  Article 24.A.3 made an equity participation payment contingent upon an equity event.  The Grievants did not present any evidence that an equity event occurred.   Article 24.A does not mention a cash payment like the one established by the March 15, 2017 LOA.  No equity event occurred prior to the elimination of Article 24.A on March 15, 2017.

The extrinsic evidence does not support the Grievants' claims.  The Union and Company negotiators intent was that Article 24 would not survive after a flight attendant ended Company employment.  The practice of applying Article 24.B, which covers profit sharing, confirmed the negotiators' intent.  Flight attendants were only provided profit sharing payments if they maintained continuous employment as a flight attendant from January 1, 2012 to the time of the profit sharing distribution.  The March 15, 2017 LOA delegated to the Union the duty to determine flight attendant eligibility for a share of the $36.5 million.  The Union followed the past practice for making profit sharing payments.

Even if Article 24.A remains applicable, the plain language of the provision does not support Grievants' claim.  The introduction to Article 24.A specifically refers to flight attendants.  Article 2.32 of the Agreement defines a "flight attendant" as an employee of the Company whose name appears on the seniority list.  None of the Grievants were flight attendants

covered by Article 24.A on March 15, 2017 because they did not fit within the Article 2.32 definition of a flight attendant.

The Grievants misplace their reliance on Article 24.D.  Even if a flight attendant on the seniority roster as of January 1, 2012 has a potential entitlement to equity participation payments, the provision does not say "all" flight attendants on the seniority list as of January 1, 2012.  The language merely states the benefit is exclusively for flight attendants on the roster as of January 1, 2012 which can mean some, instead of all, of these flight attendants.

Article 24.D applies equally to Articles 24.A and 24.B.  Only flight attendants both employed at the time of the profit sharing payment and on the seniority list as of January 1, 2012, received profit sharing payments.  Grievants were excluded from profit sharing after they left Company employment.  Grievants never objected to the manner in which the Company made profit sharing payments and so, the past practice is binding on the Grievants.  The way profit sharing was distributed demonstrates the proper interpretation of Article 24.D.

The Grievants did not prove that the Union or the Company violated the March 15, 2017 LOA in the methodology for allocating the $40 million among flight attendants.  The March 15, 2017 LOA broadly provides that the Union "in its sole discretion" shall determine a flight attendant's eligibility to receive a cash payment.  When the Union exercised its discretion, it rightly used the past practice that had developed for the profit sharing payments as the eligibility requirements for a flight attendant to receive a share of the $40 million.

The Company petitions the Board to deny the grievance.

VI.   DISCUSSION

The parties were unable to stipulate on an issue to present to the Board.  Not surprisingly, the Grievants on the one hand, and the Company and Union on the other hand, have framed their respective issues to induce their desired outcomes.  Instead of adopting one of the parties' issues, this Board opts to fashion distinct and specific issues based on the evidence and the arguments.

The threshold issue is whether Article 24.A was operable when the Company promised to pay $40 million to flight attendants per the March 15, 2017 LOA.

The beginning point for interpreting the contract language is to examine the words adopted by the negotiators and to attribute the usual and ordinary meaning to those words. Under this rule of contract construction, Paragraph A(1) of the March 15, 2017 LOA is clear and unambiguous.  It provides that the Company's obligations in the March 15, 2017 LOA constitute ". . . full and complete satisfaction of all of the Company's obligations in respect of the Equity Participation and Article 24A . . ."  The obligations set forth in the March 15, 2017 LOA replaced the obligations in Article 24.A.

Consequently, paragraph A(1) of the March 15, 2017 LOA cancelled Article 24.A of the Agreement.  The moment the Union and Company entered into the March 15, 2017 LOA, Article 24.A was extinguished.  When the Company distributed the available pool of $36.5 million, in accord with the allocation schedule developed by the Union, Article 24.A was non-existent and therefore, neither the Union nor the Company could violate Article 24.A.

When the parties jettisoned Article 24.A, they nullified all of its subsections, including 24.A.3.  Contrary to Grievants' claim, the establishment of the $40 million pool cannot possibly be construed as an equity event, because not only was Article 24.A.3 gone, but also the payments

made pursuant to the March 15, 2017 LOA were not an equity event even though the March 15,

2017 LOA is entitled "Equity Participation Payment". The title is referring to the Company's

benefit of the bargain under the March 15, 17 LOA, that is, complete relief from any potential,

future equity payment. The $40 million is not equity. The $40 million is a lump sum cash

payment. The March 15, 2017 LOA does not provide the flight attendants with any type of

equity akin to the examples in Article 24.A.3. Therefore, Article 24.A.3 ceased to be effective

and was superceded by the cash payment (a non-equity event) set forth in the March 15, 2017

LOA.

The answer to the first issue is that Article 24.A was not operable at the time the

Company committed to paying flight attendants $40 million.

The second issue is whether or not the negotiation of, or the contents of, the March 15,

2017 LOA was fatally flawed so that Article 24.A remained in effect subsequent to March 15,

2017.

This issue concerns the Grievants' contention that the Union breached its duty of fair

representation. However, as will be discussed below, the Board will consider the duty of fair

representation only within the context of the relevant contents of the March 15, 2017 LOA.

The Grievants argue that the Union arbitrarily excluded them from receiving

proportionate shares of the $40 million pool when the Union promulgated the eligibility

requirements. While the Grievants did not directly articulate their arguments in the following

fashion, they essentially argue that Paragraph A(2) of the March 15, 2017 LOA is

unconscionable or unenforceable because it arbitrarily gave the Union absolute discretion to

decide who was eligible for receiving a payment from the $40 million pool.  Alternatively, the

Grievants assert that the Union could not exclude Grievants when it exercised this discretion.

At the onset, the Board notes that Grievants Glasscock and France did not object to the

negotiation of the 2014 tentative agreement which contained eligibility criteria identical to those

the Union adopted for the $40 million payout (albeit the tentative agreement involved much less

money).   The 2014 tentative agreement provided that to be eligible for a payment, a flight

attendant had to be on the seniority roster as of January 1, 2012 and currently employed by the

Company.   The absence of any objection from Grievants France and Glasscock demonstrates

that Grievants believed the Union was acting fairly and rationally when it negotiated the 2014

tentative agreement which creates a presumption that the Union was also acting fairly and

rationally when it developed the eligibility criteria for receiving payments from the $40 million

pool.

Besides this factual evidence, the law creates a similar presumption.   A labor

organization may reasonably prefer one class of employee over another class, especially when

the preferred class is currently represented by the labor organization.   In *Demetris* v. *Transport

Workers Union*, 862 F.3d 799 (9th Cir., 2017), the U.S. Ninth Circuit Court of Appeals held that a

union could exclude retirees, who had opted for benefits under a separation agreement, from

participating in an equity benefit paid to active employees.   The Court adjudged that a labor

organization's conduct is not arbitrary when it exercises its judgment unless the exercise of

judgment is without a rational basis or explanation.[10]   The Grievants must demonstrate that the

---

[10] When it bargains, a labor organization has broad latitude to agree to terms that may help or hurt employees for the overall good of the bargaining unit unless it acts discriminatorily or in bad faith. *Ford Motor Co.* v. *Huffman,* 345 U.S. 330 (1953); *Vaca* v. *Sipes*, *supra*.

Union acted irrationally when it formulated the flight attendants' eligibility requirements for distributing the $36.5 million pursuant to the discretion afforded the Union by the March 15, 2017 LOA.   Per *Demetris*, the Union is not irrational merely because is prefers present employees over former employees.

The Union was rational in promulgating the eligibility requirements because it not only exercised reasonable judgment, but it also followed the past practice evinced by the application of flight attendant eligibility for participating in the Article 24.B profit sharing program.

To receive a profit sharing distribution, pursuant to Article 24.B, the flight attendant had to be on the seniority roster as of January 1, 2012 and still be employed at the Company at the cut off date which was either at or immediately before the day of the profit sharing payment. Even if a flight attendant worked for the Company for the full calendar year covered by the profit sharing distribution, a flight attendant did not receive a payment if the flight attendant was no longer employed on the cutoff date.  Grievants were aware of this profit sharing distribution practice.  Some of the Grievants participated in the profit sharing for one or two years and when they did not receive profit sharing distributions thereafter, they failed to grieve.   Under the Grievants' theory herein, Grievants would be entitled to continue to receive profit sharing payments for the portion, or all, of the year that they worked before severing their employment with the Company.  The absence of any grievance estops the Grievants from now contending that such eligibility criteria is unreasonable.  In other words, the Grievants can hardly object to eligibility criteria for the $40 million pool when they accepted the same eligibility criteria for profit sharing.

The Board observes that the Union could also reasonably decide to fashion eligibility requirements that included Grievants.  Other results are also reasonable.  For example, the Union could have reasonably included flight attendants hired subsequent to January 1, 2012 because many of these new hires, like Grievants, worked under concessionary employment conditions.

Last, the Union could reasonably decide that the flight attendants that maintained continuous employment were more deserving of a share of the $40 million than former flight attendants who no longer had any loyalty to, or relationship with, the Company.

The March 15, 2017 LOA vested the Union with broad latitude to select reasonable and appropriate eligibility criteria.  It did so.

Therefore, the answer to he second issue is that there was no fatal flaw concerning the negotiation of, or the contents of, the March 15, 2017 LOA.  Article 24.A did not survive beyond March 15, 2017.

The third issue is whether Grievants attained a vested right to equity benefits before Article 24.A expired.

The Grievants bear the burden of proving that at some point, while Article 24.A was effective, they acquired a permanent, perpetual right to participate in any future equity payments or any payment the Company made to satisfy its obligations in Article 24.A.

An employer and a labor organization entered into a new collective bargaining agreement which changed the terms of the predecessor agreement by requiring retired workers to contribute to the cost of their health benefits.  Under the predecessor agreement, the employer paid retirees (as well as surviving spouses and dependents) the full health benefit contribution.  The Supreme Court held that when interpreting collective bargaining agreement provisions, a vested right can

be neither inferred nor implied. The Court went on to observe that ambiguities cannot, standing

alone, create lifetime promises. *M&G Polymers, USA* v. *Tackett*, *supra*. Thus, the ordinary rule

is that a labor organization and employer can agree to modify or eliminate a contract benefit,

absent language that the subject matter could never be left to the contingencies of future

negotiations. A federal court held that even language stating that benefits "will be continued"

into retirement does not insulate the benefits from being altered in a future collective bargaining

agreement. *Fulghum* v. *Embarq*, 2015 WL3632490 (D.C. Kan. 2015). A vested right must

unconditionally arise prior to the expiration of a collective bargaining agreement. *Litton*

*Financial Printing Division, Litton Business Systems, Inc.* v. *National Labor Relations Board*,

502 U.S. 190 (1991). Thus, the language in Article 24.A of the Agreement must reflect the

parties indisputable intent to establish a vested, perpetual, and unalterable right to an equity

participation for every flight attendant on the seniority roster as of January 1, 2012, regardless of

when the equity event occurred.

A perusal of the language Article 24.A reveals that the provision does not grant Grievants

any vested right. Article 24.A.5, which has the subtopic "Vesting" does not contain any

terminology creating a right that lasts forever. Indeed, Article 24.A.5 addresses a possible

reduction in rights, as well as a reference to the contract concessions. It is plausible that a vested

right could be implied in Article 24.A.3, but the right could only mature if an equity event

occurred. This Board has already decided that Article 24.A.3 did not exist when the $40 million

pool was established and that the $40 million cannot possibly and legitimately be characterized

as an equity event. Next, there is not any language in Article 24 (or, more specifically in Article

24.A) which absolutely bars the Union and the Company from amending or deleting the contract

provision.   Indeed, the parties considered, and almost did, expunge Article 24.A when they

negotiated the 2014 tentative agreement.

The extrinsic evidence does not support the Grievants' argument that a vested right

accrued to them.  The negotiators of Article 24.A not only testified that there was not any intent

to create a vested right, but also, the negotiators believed that the reference to Article 24.D, with

its allusion to Article 10, meant that a flight attendant still had to be employed at the Company

whenever any equity participation payment was made.  This Board realizes that the parties have

a dispute about the interpretation of Article 24.D.   The Grievants contend that the only

requirement is that a flight attendant be on the seniority roster as of January 1, 2012.   The

Company and the Union contend that the reference to Article 10 in conjunction with the Article

2.32 definition of a flight attendant means that the Article 24.D only applies to presently

employed flight attendants.  The Board need not decide the dispute surrounding Article 24.D for

reasons that this Board has already set forth in this Opinion.  Article 24.D modified Article 24.A.

When Article 24.A ceased to exist, Article 24.D became irrelevant.

In sum, based on the direct evidence and the extrinsic evidence, Grievants did not acquire

or possess any permanent, vested right to receive payments from the $40 million pool.

Last, Grievants raise an equitable argument.  Grievant France emphasized that she made

a great sacrifice by absorbing the concessions during the period that she worked for the

Company subsequent to September 1, 2011.  She and the other Grievants assert that it is fair and

equitable that they be given a *pro rata* share of the $40 million pool since they worked under the

harsh, concessionary arrangement.  This is an equitable argument.  To a great extent, this Board

has previously addressed and rejected this argument.  We ruled that the Union was reasonable

regardless of whether it included or excluded the Grievants when it developed the eligibility requirements for participation in the $40 million pool. Nevertheless, this Board does not sit to dispense equity among the parties. Our jurisdiction is relegated to interpreting and applying the terms of the collective bargaining agreements. We do not create agreement terms. Indeed, we cannot add to, delete or change provisions in the Agreement and the March 15, 2017 LOA. Equity is best deferred to the bargaining table.

The Board concludes that the Grievants failed to prove that either the Union or the Company violated Article 24 of the Agreement or any provision of the March 15, 2017 LOA, a collective bargaining agreement that was properly negotiated.

### AWARD AND ORDER

The grievances are denied.

Dated: October 23, 2018

✔ I concur / _____ I dissent          ✔ I concur / _____ I dissent

_____          _____
Ed Gilmartin                                  Howard Diamond
Association Member                           Company Member

_____
John B. LaRocco, Arbitrator
Neutral Member

John B. LaRocco
Arbitrator
Mediator & Factfinder
2001 H Street
Sacramento, California 95811