**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

ADELINE CLARK, et al.

    Plaintiffs,

vs.

FRONTIER AIRLINES, INC.

    Defendant.

Case No. 4:19-cv-00012-JEG-RAW

**PLAINTIFFS' BRIEF IN RESISTANCE
TO DEFENDANT'S MOTION TO
DISMISS FIRST AMENDED AND
SUBSTITUTED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ……………………………………………………………… 2

STATEMENT OF FACTS ……………………………………………………...… 3

ARGUMENT …………………………………………………………………..... 5

I.    THE MOTION TO DISMISS UNDER RULE 12(B)(6) SHOULD BE
DENIED BECAUSE THE PLAINTIFFS HAVE STATED A
LEGALLY SUFFICIENT CLAIM ………………………………… 6

    a. The System Board of Adjustment failed to comply with the requirements
of the RLA ……………………………………...……..…… ..… 7

    b. The System Board of Adjustment violated Plaintiffs' due process rights …… 9

    c. Plaintiffs had a vested right to Equity Participation ……...……………….………12

II.    DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMMON-LAW
CLAIMS SHOULD BE DENIED BECAUSE INTERPRETATION OF THE
COLLECTIVE BARGAINING AGREEMENT IS UNNECESSARY ……..…..… 14

    a.  Promissory Estoppel ………………………………………...……… 14

    b.  Unjust Enrichment ………………………………………..…… 15

CONCLUSION ……………………………………………………………..… 17

## INTRODUCTION

Plaintiffs are a group of approximately 100 former flight attendants who were employed by the Defendant, Frontier Airlines, Inc. ("Frontier") for varying lengths of time.  For many years, Frontier experienced significant financial difficulties.  In 2008 the Company filed for bankruptcy.  As it struggled to remain afloat, Frontier began a series of aggressive cost-cutting measures to downsize the company.

While Frontier was attempting to quickly reduce its operating costs, Plaintiffs and other employees experienced wage and benefits reductions, as well as reductions in force.  Soon after, the Frontier flights attendants voted to unionize.  Plaintiffs were represented by the Association of Flight Attendants – CWA ("Union").  In 2011, the AFA negotiated, and the members ratified, a collective bargaining agreement ("CBA") outlining various terms and conditions of employment.  Among them was Article 24, a provision allowing for "Equity, Profit-Sharing, and Wage & Benefit Snapbacks".

Between January 1, 2012 and March 15, 2017, Plaintiffs separated their employment with Frontier for various reasons and at various times.  Only after leaving employment, did the Plaintiffs learn that, according to Frontier and the Union, they would no longer be eligible for Article 24 benefits even though they had endured the wage and benefit reductions which those benefits were specifically designed to offset.  Thereafter, Plaintiffs brought claims for (1) Breach of Contract, (2) Promissory Estoppel, and (3) Unjust Enrichment against Frontier.

Labor-management relations in the airline industry are governed by the Railway Labor Act. 45 U.S.C. §151 *et seq.* ("RLA").  The RLA covers every common carrier by air that is engaged in interstate commerce.

## STATEMENT OF FACTS

The Plaintiffs are approximately 100 former Frontier flight attendants located throughout the United States.  *See* Am. Compl. (ECF No. 10) ¶ 1.  The Defendant, Frontier Airlines, Inc. is a Delaware corporation with its principal place of business located in Denver, Colorado.  (*Id.*  ¶ 2.) Frontier is authorized to transact business in the State of Iowa, pursuant to a Certificate of Authority (#351804) filed with the Iowa Secretary of State.  (*Id*).  Frontier was and is a "carrier" within the meaning of the RLA.  (*Id.*  ¶ 6.)

Frontier and the Union negotiated to form a collective bargaining agreement (CBA) in 2011. ( *Id.* ¶ 7.)  On October 11, 2011, Frontier and the Union agreed to Flight Attendant Restructuring Investments (commonly known as "concessions") which were memorialized in a letter signed by the parties.  (ECF No. 10-2).  Three days later, on October 14, 2011, Frontier and the Union executed the CBA.  (*Id*).

The CBA included, in relevant part, Articles 24A and 24D, which provide as follows:

### ARTICLE 24 EQUITY, PROFIT-SHARING, AND WAGE & BENEFIT SNAPBACKS

**A.  EQUITY PARTICIPATION** Flight Attendants will be entitled to equity in the Company (the "Equity Participation") as described herein:

1. The value of the Equity Participation is $16.0 million.

2. The Equity Participation value will be converted to first dollar equity in the Company at a ratio of the greater of $0.18 per dollar of new equity invested in the Company, or any higher rate offered to any other key stakeholder in the restructuring process.

3. The terms of the Equity Participation by and for the benefit of the Participating Flight Attendants will be equal to the terms obtained by a third party investor in an Equity Event or, if the

3

Equity Event is a public offering of securities in the Company, the form of securities offered in the public offering.

4.  Other minority investor rights by and for the benefit of the Participating Flight Attendants will be negotiated, including tagalong rights and customary drag along rights.

5.  Vesting: The Equity Participation will vest in proportion to the actual Investments as set forth in the letter dated October 11, 2011 between the Company and the Union entitled "Flight Attendant Restructuring Investments". To the extent the Investments as set forth in the referenced letter cease or are not made, the value of the Equity Participation in Paragraph A.1.a above will be reduced by the net present value discount rate of 15%.

**D.  ADDITIONAL PROVISIONS**  Equity Participation as set forth in Paragraph A above and participation in the PSP as set forth in Paragraph B above, will be exclusively for Frontier Flight Attendants on the Frontier Flight Attendant Seniority List as of January 1, 2012. This exclusion includes anyone who changes Class and Craft as outlined in Article 10 Seniority of this Agreement.  *See* Am. Compl. (ECF No. 10-1.)

The purpose of Article 24 was to provide incentives to flight attendants for the restructuring investments identified in the October 11, 2011 letter.  (ECF No. 10) ¶ 10.  Each of the Plaintiffs were on the Frontier Flight Attendant Seniority List on January 1, 2012.  (*Id.* ¶ 11.)

On March 15, 2017, Frontier and the Union signed a Letter of Agreement ("LOA") to modify/amend the CBA.  (*Id.* ¶ 14.)  The terms of the Agreement required Frontier to pay $40 million dollars to satisfy the Equity Participation provision of Article 24A ("Equity Payment"). (*Id*).  The Agreement further specified that the Union would have sole authority to determine which flight attendants on the seniority list would be eligible for a share of the Equity Payment. (*Id.* ¶ 15.)  Significantly, employees of both the Union and Frontier have testified under oath (in the grievance process) that the Equity Payment was an "equity event" which triggered the equity participation provisions of Article 24.

4

Despite the clear and obvious meaning of Article 24D, which required only that a flight attendant be "on the seniority list as of January 1, 2012", the Union determined (in 2017) that a flight attendant must also be "continuously employed" with Frontier through March 15, 2017 in order to be eligible for an Equity Payment.  (*Id.* ¶ 16.)  As a result, Plaintiffs were denied an Equity Payment because they left employment with Frontier prior to March 15, 2017. ( *Id.* ¶17.)

On May 25, 2017 and June 13, 2017, the Plaintiffs filed a Grievance with Frontier, through their undersigned counsel, alleging they were entitled to a share of the Equity Payment due to their placement on the flight attendant seniority list as of January 1, 2012.  (*Id.* ¶ 18.) Frontier held a telephonic hearing on June 20, 2017 and issued a denial of the consolidated grievances on June 30, 2017.  (*Id.* ¶ 23).  Thereafter, the Plaintiffs timely appealed their denial to the System Board of Adjustment, which conducted a hearing on March 20, 2018.  (*Id.* ¶25, 29.) The Board issued an Opinion and Award on October 23, 2018, denying Plaintiffs' collective grievance.  (*Id.* ¶34.)

## ARGUMENT

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept Plaintiffs' factual allegations as true and view them in the light most favorable to the nonmoving party. *Great Rivers Habitat All. v. Fed. Emergency Mgmt. Agency*, 615 F.3d 985, 988 (8th Cir. 2010); *Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768–69 (8th Cir. 2012). "The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint."  *Doyel v. McDonald's Corp.*, 2009 U.S. Dist. LEXIS 9622 at 3 (E.D. Mo. 2009). The Petition must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

I.      **THE MOTION TO DISMISS UNDER RULE 12(B)(6) SHOULD BE DENIED**
        **BECAUSE PLAINTIFFS HAVE STATED A LEGALLY SUFFICIENT CLAIM**

The Defendant's motion seeks to dismiss Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6)

due to a purported failure to state a claim for which relief can be granted.  In making its

argument, the Defendant fails to identify any deficiencies in the facts related to the substance of

Plaintiffs' claims (Breach of Contract, Promissory Estoppel, and Unjust Enrichment). Instead,

Defendant relies almost exclusively on its belief that Plaintiffs failed to allege the facts necessary

for the Court to exercise jurisdiction.

As stated in Fed. R. Civ. P. 8(a), a complaint must meet certain minimum requirements,

including "a short and plain statement of the grounds for the court's jurisdiction".  Fed. R. Civ.

P. 8(a)(1).  Paragraphs three and four of Plaintiffs' amended complaint clearly outline the basis

for this Court's jurisdiction by identifying both original and supplemental jurisdiction of the

claims.  Further, paragraph five states the Plaintiffs' grounds for venue.  Plaintiffs' amended

complaint meets the legal standard set forth in this rule.

Judicial review of Adjustment Board orders is limited to three specific statutory grounds:

(1) failure of the Adjustment Board to comply with the requirements of the Railway Labor Act;

(2) failure of the Adjustment Board to conform, or confine, itself to matters within the scope of

its jurisdiction; and (3) fraud or corruption. 45 U. S. C. § 153 (First) (q). Only upon one or more

of these bases may a court set aside an order of the Adjustment Board. See *Andrews* v. *Louisville*

*& Nashville R. Co.,* 406 U. S., at 325; *Locomotive Engineers* v. *Louisville & Nashville R. Co.,*

373 U. S. 33, 38 (1963).

In addition to the statutorily created parameters of review, a majority of federal courts

have recognized that Board arbitration decisions are reviewable for possible due process

violations. *Goff v. Dakota, Minn. & E. R.R. Corp.*, 276 F.3d 992, 997 (8th Cir. 2002); *See also Union Pac. R.R. v. Price,* 360 U.S. 601, 616, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959) (finding awards of the National Railway Adjustment Board reviewable for a violation of due process); *Shafii v. PLC British Airways,* 22 F.3d 59, 64 (2d Cir. 1994) ("Relinquishing courts' ability to review the NRAB's procedures for due process violations would leave unprotected a plaintiff's legitimate constitutional right to be treated in accord with due process before the Board."); *Armstrong Lodge No. 762 v. Union Pac. R.R.,* 783 F.2d 131, 135 (8th Cir.1986) (reviewing an arbitration award where party argued the arbitration hearing failed to meet the requirements of due process).

### a.      The System Board of Adjustment failed to comply with the requirements of the RLA.

System Boards of Adjustment are created and authorized under the RLA.  Although the statute provides some flexibility for boards to select a chairman and create their own hearing rules, such flexibility does not override the strict requirements of the statute.  §157 requires the board of adjustment must (1) give the parties a full and fair hearing; (2) allow the parties an opportunity to present evidence in support of their claims; and (3) allow the parties an opportunity to present their case in person, by counsel, or by other representative as they may respectively elect.  45 U.S.C. §157 (Third)(b).

In this case, Plaintiffs first allege that the Board failed to comply with the first requirement by refusing to offer Plaintiffs a "full and fair" hearing.  Though the hearing was scheduled nearly seven months in advance, the Plaintiffs' learned the identity of the Company and Union Board representatives just *four days* prior to their March 20th hearing.[1]  For the

---

[1] The Defendant takes exception to Plaintiffs' description of this disclosure as "immediately prior" to the hearing. However, the hearing was scheduled seven months in advance and the parties were traveling hundreds of miles to participate.  Thus, Plaintiffs believe such a description is relative to the circumstances and, therefore, appropriate.

reasons demonstrated below, the appointment and subsequent service of these Board members prevented the hearing from being both "full" and "fair".

Union Representative Edward Gilmartin

Mr. Gilmartin serves as the senior legal counsel for the Union.  As such, he played a lead role in the negotiations on behalf of the Union.  Further, Mr. Gilmartin participated in subsequent negotiations in 2014-2017 during the critical time when the Union and the Company were attempting to resolve certain issues surrounding Article 24 specifically.  His bias against the Plaintiffs revealed itself when, during the Board arbitration hearing, he personally objected to a question posed to the Union by Plaintiffs' counsel.

Company Representative Howard Diamond

Similar to Gilmartin, Mr. Diamond serves as the in-house counsel for the Company. However, Board Member Diamond's personal involvement in this matter is even more pronounced.  Diamond executed many documents on behalf of the Company that are central to this case. He was also the author of the initial letter to Plaintiffs, denying their request for equity payments.  His opposition to Plaintiffs' grievance was well known and, more importantly, *decided* before the Board ever heard the evidence.

The appointment and service of Diamond and Gilmartin deprived the Plaintiffs of an opportunity to have a "fair" hearing by any true meaning of the word.  Their opinions were already known prior to any opening statements, evidence, or presentation of witnesses. Though Plaintiffs strongly objected to the presence of these two board members, Diamond and Gilmartin were allowed to continue on the Board.  Despite the assurances to the contrary, it is simply

impossible to believe either of these board members would set aside their prior opinions, knowledge, and beliefs in order to fairly consider the case.

Likewise, and perhaps more importantly, the service of Diamond and Gilmartin as board members deprived the Plaintiffs of another type of fairness – one free from conflict.  As demonstrated above, these representatives were more than just board members - they were participants to many of the activities and transactions underlying this case. *They were witnesses.* This presented more than just a mere partisan affiliation as Company and Union representatives. Rather, it was an impermissible and direct conflict of interest which prevented the Plaintiffs from obtaining a fair hearing.[2]

### b.  The System Board of Adjustment violated Plaintiffs' due process rights.

The Frontier System Board is a three-member panel consisting of a representative chosen by Frontier and another chosen by the Union, each of whom are unquestionably and unapologetically "adverse" to the claims being submitted by the Plaintiffs.[3]  The third member does not work for the Union or Frontier, but was specifically chosen by them.  Both Frontier and the Union representatives had a well-vested interest in the outcome – to protect their financial resources and those of their membership.  And, as demonstrated above, these representatives had *personally participated* in negotiating the underlying CBA and/or denying the initial grievance by Plaintiffs.

A fundamental precept of due process has been that an interested party in a dispute cannot also sit as a decision-maker. *Internation Ass'n of Machinists and Aerospace Workers v. Metro-North Commuter Railroad*, 24 F.3d 369 (2nd Cir. 1984); See, e.g., *Withrow v. Larkin*, 421

---

[2] Their appointment as Board members arguably prevented the Plaintiffs from achieving a "full" trial as well because neither Diamond nor Gilmartin could be questioned as witnesses about the underlying facts and events.
[3] Although the Plaintiffs submitted their initial grievance against Frontier, the union was permitted to participate.

U.S. 35, 46-47, 95 S. Ct. 1456, 1464, 43 L. Ed. 2d 712 (1975); *Gibson v. Berryhill*, 411 U.S. 564, 578-79, 93 S. Ct. 1689, 1697-98, 36 L. Ed. 2d 488 (1973).   Under these circumstances, the likelihood of receiving a fair hearing was impossible.

> ***Black's Law Dictionary defines due process as a course of legal proceedings conducted in accord with rules and principles that have been established in the United States' system of jurisprudence.  Perhaps a simple definition of due process is better.  Due process means a fundamental fairness.  We will only have confidence in and defend a procedure that guarantees fairness to the parties who have a stake in the outcome of the dispute.***  John B. LaRocco, <u>Due Process in the Railroad Industry</u>, *Due Process in Railway Hearings and Appeals*, p. 233 (2009); <u>https://naarb.org/proceedings/pdfs/2009-233.pdf</u>.

Though Chairman LaRocco opined that the composition of the Board was technically permissible, he did not determine whether it was fair.[4]  In that respect, the failure of the Board to adhere to the "full and fair" hearing requirements of the RLA also represents the lack of due process afforded to Plaintiffs.

This case is analogous to *Edwards v. Capital Airlines*, 176 F.2d 755 (D.C. Cir. 1949).  In *Edwards*, two pilots sought judicial review of an unfavorable Board decision.  In permitting judicial review, the court stated:

> Persons in their situation must have available to them, at some point, an impartial look at a decision, thus made, denying their claims to substantial rights. This is the time-honored function of an equity court. The general principle, applicable alike to judicial and to administrative determinations, is too well settled to require citation of authority. We think that the danger to the rights of the non-member few, clearly inherent in the combination of circumstances here present, calls for the application of that doctrine. *Edwards* at 761.

Notably, the *Edwards* Board was composed of an equal number of union and company representatives.  The pilots' claims were adverse to the union.  And, like the Plaintiffs in the case at hand, the grievant pilots were unrepresented on the Board.

---

[4] The Board's authority was limited to whether Frontier violated the CBA regarding the Equity Payments.

Later, in *Hornsby v. Dobard*, the United States Court of Appeals for the Fifth Circuit came to the same conclusion when reversing a lower court's order for dismissal. [5] *Hornsby v. Dobard*, 291 F.2d 483 (5th Cir. 1961). The *Hornsby* Court recognized the inherent unfairness of requiring a party to submit their case to a tribunal composed of their known adversaries "from whom [they] could not expect to receive a fair and impartial hearing." *Id.* Upon remanding the case for judicial review, the Court stated:

> If it is shown that the union representatives on the Board have such personal interests arising out of their union memberships or employment, or from the agreement between the union and the carrier as would justify an inference of bias or partiality by reason of interest, then the right to a judicial review will not be denied. *Edwards v. Capital Airlines, Inc.*, 1949, 84 U.S.App.D.C. 346, 176 F.2d 755, (certiorari denied 338 U.S. 885, 70 S.Ct. 186, 94 L.Ed. 543.) Thus if it is here made to appear to the district court that the Board, as constituted by the Act, was not such an unprejudiced tribunal as could afford to Hornsby the fair and impartial hearing and decision that due process requires, then its duty will be to review the Board's order.

Courts have also been sensitive to the potential inequity of requiring employees to "submit their controversy to a group which is in large part chosen by the [defendants] against whom their real complaint is made,'" *Glover v. St. Louis-San Francisco Ry. Co.,* 393 U.S. 324, 330, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969), *quoting Steele,* 323 U.S. at 206, 65 S.Ct. at 233, and they realize that such collusion between employer and union is a real possibility. *See Graf, 697 F.2d at 781* (collusion between union and employer would render remedies under arbitration provisions of RLA futile).

Such collusion and inequity was on full display in this case. Though the grievance was filed against the Company, the Union provided the primary defense, organized the hearing, and led communications between the parties.

---

[5] Like the 8th Circuit, the 5th Circuit also recognizes a right to judicial review on due process grounds.

### c. *Plaintiffs had a vested right to Equity Participation*

The issue of whether a right has vested has been squarely addressed by the Eighth Circuit in *Maytag Corp. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am* where the Court established that "[A] 'vested right' is 'a right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent'" *Maytag Corp. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 687 F.3d 1076, 1084 n. 5 (8th Cir 2012) (quoting *Halbach v. Great-W. Life & Annuity Ins. Co.,* 561 F.3d 872, 877 (8th Cir. 2009).

Recently, the United States Supreme Court articulated a well-defined standard that must be used to determine whether a collective bargaining agreement provides for vested benefits.  In *M & G Polymers USA LLC v. Tackett*, the Court was faced with reviewing the long-standing principle that vesting could be inferred in employee contracts.  *M & G Polymers USA LLC v. Tackett*, 135 S. Ct. 926 (2015).  The *Tackett* Court concluded that no such inferences could be presumed.  It follows then, that where the words of a contract are clear, an alternate meaning also cannot be inferred.

In 2018, the Supreme Court once again emphasized the importance of clear, unambiguous language by stating "[i]f the parties meant to vest health care benefits for life [or until age 65], they easily could have said so." *CNH Industrial N.V. v. Reese*, 138 S. Ct. 761,766 (2018).  Here, the parties did just that.  Article 24A.5 describes the rights for equity participation and makes clear that the parties intended for those rights to be vested.  It states:

> Vesting: The Equity Participation will vest in proportion to the actual Investments as set forth in the letter dated October 11, 2011 between the Company and the Union entitled "Flight Attendant Restructuring Investments". To the extent the Investments as set forth in the referenced letter cease or are not made, the value of the Equity Participation in Paragraph A.1.a above will be reduced by the net present value discount rate of 15%.

12

The very first sentence clearly and unambiguously states that "equity participation will vest" and that the value will be calculated "in proportion to the actual Investments as set forth in the letter dated October 11, 2011."[6] Nothing in this paragraph or section state or even infer that the right to equity participation is subject to contingency or can be withdrawn.[7] As the Court held in *Tackett*, "[W]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Tackett*. at 933.

Yet, somehow, the Defendant and Board ignore the clear wording of the contract and, instead, argue that vesting was contingent on other factors. They ask this Court to believe that the word "vesting" does not mean the parties actually intended that the equity participation vest. The Board opined that because Article 24A.5 allowed for the equity rights to be reduced, this negated any intent to vest any rights to equity payments. Similarly, the Board stated that equity participation did not vest until there was an "equity event". They offer no legal authority for this interpretation. Just as the *Tackett* Court rejected an inference that vesting was intended, this Court should reject any inference that vesting was not intended when the clear language of the paragraph states otherwise.

Under Article 24A, the Plaintiffs had a right to "equity participation" when and if it occurred. In fact, it *did* occur. On March 15, 2017, Frontier and the Union signed a Letter of Agreement requiring Frontier to pay $40 million dollars to satisfy the Equity Participation provision of Article 24A ("Equity Payment"). (*See* Attached as Exhibit A to Declaration of Kellie L. Paschke.) The Agreement was titled "Equity Participation Payment". Importantly,

---

[6] These "investments" are the concessions made by the flight attendants.
[7] Though the Board acknowledges Paragraph 24A.5 includes the title "Vesting", they inexplicably argue that the paragraph "does not contain any terminology creating a right that lasts forever." Such a position appears illogical and unsupportable in light of *Tackett* and *Reese,* which both require a specific intent to vest be written into the contract.

employees of both the Union and Frontier have testified before the Board that this Equity

Payment was an "equity event" which triggered the equity participation provisions of Article 24.

## II.   DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMMON-LAW CLAIMS SHOULD BE DENIED BECAUSE INTERPRETATION OF THE COLLECTIVE BARGAINNG AGREEMENT IS UNNECESSARY

In addition to their claim for breach of the CBA, Plaintiffs' also assert the common-law

claims of promissory estoppel (Count II) and unjust enrichment (Count III).

### a.   Promissory Estoppel

The theory of promissory estoppel allows individuals to be held liable for their promises

despite an absence of the consideration typically found in a contract.  4 Samuel Williston,

Williston on Contracts § 8.4, at 41 (1992).  "[C]ourts have applied the principle of estoppel in

effect to form a contract, when the promisee suffered detriment in reliance on a ... promise."  Id.;

see also *Friedman v. BRW, Inc.*, 40 F.3d 293, 296 (8th Cir. 1994) (stating that the effect of the

doctrine of promissory estoppel "is to imply a contract in law where none exists in fact"); *Miller

v. Lawlor*, 245 Iowa 1144, 1152, 66 N.W.2d 267, 272 (1954) ("'Promissory estoppel' is now a

recognized species of consideration."); *Huhtala v. Travelers Ins. Co.,* 401 Mich. 118, 257

N.W.2d 640, 647 n.16 (1977) (stating that in promissory estoppel claims, detrimental reliance on

one side will suffice as "consideration").  When this court adopted the doctrine of promissory

estoppel, we relied on the principles of law found in the Restatement of Contracts section 90

(1932). . .  Because the Restatement (Second) of Contracts contains a nearly identical statement

of these principles, we quote from the latter Restatement:

> A promise which the promisor should reasonably expect to induce action or forbearance
> of a definite and substantial character on the part of the promisee or a third person and
> which does induce such action or forbearance is binding if injustice can be avoided only
> by enforcement of the promise.     Restatement (Second) of Contracts § 90, at 242 (1981).

14

The court has established the following elements as essential for recovery under a theory of promissory estoppel: "(1) a clear and definite oral agreement; (2) proof that plaintiff acted to his detriment in reliance thereon; and (3) a finding that the equities entitle the plaintiff to this relief." Johnson v. Pattison, 185 N.W.2d 790, 795 (Iowa 1971); accord *National Bank v. Moeller*, 434 N.W.2d 887, 889 (Iowa 1989); *In re Estate of Graham,* 295 N.W.2d 414, 418 (Iowa 1980); *Schoff v Combined Ins. Co. of Am..*, 604 N.W.2d 43, 48 (Iowa 1999).

In the present case, the Plaintiffs have met this burden. Separate from the contents of the CBA, Frontier made definite promises, through company communications and public comments, to allow Equity Participation for flight attendants. These communications and public comments made no mention of continuous employment. Plaintiffs relied on Frontier's clear promises that they were "entitled" to equity when ratifying the agreement. Only after the CBA was ratified did Frontier seek to change the terms by requiring continuous employment. Such action denies Plaintiffs of their equity, which can only be remedied through enforcement of the promise.

### b. *Unjust Enrichment*

A party asserting unjust enrichment must allege that another has received a benefit, the retention of which would be inequitable. *See Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004); *Unisys Corp.*, 637 N.W.2d at 157; *HPI Health Care Servs., Inc., v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). Frontier maintains that the presence of a CBA somehow prohibits Plaintiffs' claims for unjust enrichment. However, unjust enrichment is a doctrine that 'evolved from the most basic legal concept of preventing injustice.'" *In re Estate of Roethler*, 801 N.W.2d 833, 845 (Iowa 2011) (quoting *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 149 (Iowa 2001)). Plaintiffs may bring any claims necessary, even claims in the alternative, to cover their bases, including an unjust enrichment

15

claim. *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) ("A plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is *not* an express contract, then the defendant is liable for unjustly enriching himself at my expense.").

To recover for unjust enrichment, [the plaintiff] must show: (1) [the defendant] was enriched by the receipt of a benefit; (2) the enrichment was at the expense of [the plaintiff]; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances. *Lakeside Feeders, Inc. v. Producers Livestock Mktg. Ass'n,* 666 F.3d 1099, 1112 (8th Cir. 2012) (quoting *Palmer*, 637 N.W.2d at 154–55).   Importantly, determining whether Frontier was unjustly enriched <u>does not</u> require this court to interpret the CBA.

It is undisputed that the Plaintiffs were flight attendants who gave "concessions" to Frontier in the form of wage and benefit reductions.  Plaintiffs were employed by Frontier for varying amounts of time and, therefore, the value of their wage and benefit concessions were different.  However, there is no question that Frontier received the value of these concessions.  It is these concessions that form the basis of Plaintiffs' claims of unjust enrichment.

Further, it remains unclear exactly how the Company and the Union arrived at the figure of $40 million as payment for the equity.  Notably, the parties arrived at this figure *before* the Union determined who was eligible to receive payment.  Therefore, it is possible (and perhaps even likely) that Frontier and the Union used the January 1, 2012 Seniority List to negotiate the total equity payment.[8] After agreeing to $40 million, Frontier delegated its responsibility to the Union to determine eligibility for equity payments.  Only then did the Union decide that

---

[8] There were over 900 flight attendants on the Seniority List as of January 1, 2012. Less than 600 remained when the Union determined eligibility for an equity payment required continuous employment.

16

"continuous employment" was required.  This, of course, would have the net effect of increasing the payment to existing members.

## **CONCLUSION**

When reviewing a motion to dismiss, the Court must "accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *ABF Freight Sys. v. Int'l Bhd. of Teamsters*, 728 F.3d 853, 857 (8th Cir. 2013).  The court may "dismiss the case only when it appears beyond [a] doubt that the plaintiff can prove no set of facts in support of [their] claim which would entitle [the plaintiffs] to relief." *Mo. River Sys. Litig.,* 418 F.3d at 917 (internal quotations omitted).  "The issue is not whether the plaintiff will ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  For the reasons set forth above, Plaintiffs respectfully requests this Court to deny the Defendant's Motion to Dismiss.

<div style="margin-left: 50%;">

Respectfully submitted,

*/s/ Kellie L. Paschke*
Kellie L. Paschke AT# 0006038
SKINNER & PASCHKE, PLLC
204 West Hickman Road
Waukee, Iowa 50263
Telephone:     (515) 987-0022
Facsimile:      (515) 987-6972
E-Mail:  kellie@splawiowa.com
E-Mail:  beth@splawiowa.com

</div>

_/s/ Jason D. Walke_____
Jason D. Walke, AT# 0008230
WALKE LAW, LLC
204 West Hickman Road
Waukee, IA  50263
Telephone:  (515) 421-4026
Facsimile:  (515) 216-2261
E-Mail:  jwalke@walkelaw.com
E-Mail:  nphifer@walkelaw.com

ATTORNEYS FOR PLAINTIFFS